**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOSEPH PATRICK PAYNE, SR.,
Petitioner-Appellant,

v.

J. D. NETHERLAND, Warden,

Mecklenburg Correctional Center;
EDWARD W. MURRAY, Director;
MARY SUE TERRY, Attorney General;
COMMONWEALTH OF VIRGINIA,
Respondents-Appellees.

No. 95-4016

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert R. Merhige, Jr., Senior District Judge.
(CA-93-530-3)

Argued: June 3, 1996

Decided: August 19, 1996

Before WIDENER, WILKINS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wilkins wrote the majority
opinion, in which Judge Widener concurred. Judge Michael wrote a
separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Paul Farid Khoury, WILEY, REIN & FIELDING, Wash-
ington, D.C., for Appellant. Thomas Drummond Bagwell, Senior

Assistant Attorney General, OFFICE OF THE ATTORNEY GEN-ERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Michael A. Rotker, WILEY, REIN & FIELDING, Washington, D.C.; Donald R. Lee, VIRGINIA CAPITAL REPRESENTATION RESOURCE CEN-TER, Richmond, Virginia, for Appellant. James S. Gilmore, III, Attorney General of Virginia, OFFICE OF THE ATTORNEY GEN-ERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

WILKINS, Circuit Judge:

Joseph Patrick Payne, Sr. appeals a decision of the district court denying his petition for a writ of habeas corpus seeking relief from his Virginia conviction for the capital murder of David Wayne Dunford and his resulting sentence of death. See 28 U.S.C.A. § 2254 (West 1994). Finding no error, we affirm.

I.

On March 3, 1985, at approximately 6:30 a.m., inmates at the Powhatan Correctional Center in Virginia were awakening. Although the locks on the doors restricting the prisoners' movement during the night had been released, inmate Dunford remained inside his cell. Without warning, another inmate locked Dunford's door with a padlock, threw flammable liquid into the cell, and ignited the liquid with matches, resulting in a fire that burned over 70% of Dunford's body. Following nine agonizing days during which he lay hospitalized, Dunford died.

Prison officials soon came to believe that a conspiracy had existed among the inmates to murder Dunford. As the investigation ensued, inmate Robert Smith ultimately identified Payne, whose cell was

2

located near Dunford's, as the individual responsible for the acts that resulted in Dunford's death.

During Payne's trial, the only "eyewitness" to testify was Smith; he claimed to have seen Payne commit the murder. In his direct testimony, Smith acknowledged that he had been involved in the planning stages of the conspiracy, that he had multiple prior felony convictions, and that he received a ten-year reduction in his sentence for testifying against Payne and another coconspirator; other witnesses asserted that Smith was a liar and a cheat. Two additional prosecution witnesses implicated Payne in the conspiracy to murder Dunford and testified that Payne planned to commit the murder. One of these witnesses was so unstable that the prosecutor announced to the court prior to his testimony that his mental stability was questionable. The remaining witness concluded his cross-examination by stating that Payne withdrew from the conspiracy prior to the day of the murder. Consequently, it is fair to conclude that the Commonwealth's case against Payne hinged on whether the jury found Smith's testimony to be credible and that Smith's credibility was thoroughly tested.

During the presentation of his defense, Payne offered the testimony of another inmate, Frank Clements, who claimed to have seen Smith commit the murder. He further testified that Payne was taking a shower at the time of the murder. On cross-examination, however, the prosecution was able to demonstrate that Clements' testimony differed in critical respects from the testimony he had provided in the trial of one of Payne's coconspirators. Nevertheless, believing that the prosecution's case against Payne was weak as a result of inmate testimony of questionable veracity, the defense chose not to call additional inmate witnesses. Indeed, so confident was the defense that the prosecution would fail that Payne rejected an offer--extended while the jury was deliberating in the guilt phase of the trial--to permit him to plead guilty and receive a sentence that would have been concurrent to the one he was presently serving. The jury nonetheless found Payne guilty of the murder.

During the sentencing phase of the trial, the defense strategy was to capitalize on the lingering doubt the defense believed certainly must have existed in the jurors' minds. Consequently, Payne testified

that he had not committed the murder. He also introduced two psychiatric "reports" relevant to his future dangerousness.

In rebuttal, the prosecution presented the testimony of a psychologist, Dr. Arthur Centor, who was employed by the Commonwealth and who had examined Payne regarding his competency to stand trial pursuant to a court order entered in response to Payne's motion. Dr. Centor testified that prior to the examination he explained to Payne that the information provided would not be privileged and that the doctor would be permitted to testify in court about it. In response to a prosecution question concerning his opinion as to Payne's future dangerousness based on his examination, Dr. Centor testified:

> In my opinion [Payne] shows a probability for committing criminal acts of violence, which would constitute a continuing serious threat to society. This is based on his past history going back to the age of [ten], going through previous convictions, other related difficulties with the law, and the circumstances of the present alleged crime.

J.A. 285. Payne was sentenced to death.

The Virginia Supreme Court affirmed Payne's conviction and sentence on direct appeal, and the Supreme Court denied his petition for a writ of certiorari. Payne v. Commonwealth, 357 S.E.2d 500, 509 (Va.), cert. denied, 484 U.S. 933 (1987).

Payne next sought collateral review in the Virginia courts, raising a plethora of issues. With the exception of a number of his assertions that he was deprived of effective assistance of counsel and his allegations that he was denied due process by the prosecution's knowing use of perjured testimony and also by its failure to disclose inducements that had been offered in return for Smith's testimony, all of Payne's claims were dismissed by the state habeas court.

Payne offered copious evidence in support of his remaining claims during the forthcoming evidentiary hearing. He presented the testimony of several inmates who asserted that they were eyewitnesses and had seen Smith commit the murder. The testimony of these wit-

4

nesses was consistent to the extent that they all professed to have seen Smith approach Dunford's cell, lock it, and throw liquid into it immediately before the explosion. However, the testimony contained discrepancies concerning what Payne, Clements, and Smith were wearing that morning and whether Payne or another inmate had initiated a conversation immediately prior to the murder. Payne also presented the testimony of several inmates who claimed that Smith had boasted about committing the murder and had admitted that he intended to lie during the trial to implicate Payne in order to receive a reduction in sentence. In addition, Payne proffered a sixteen-page affidavit, signed by Smith, in which he fully recanted his trial testimony. Further, Payne presented evidence indicating that Smith had received an additional five-year sentence reduction, the dismissal of a forcible sodomy charge, and favorable parole consideration. Payne also offered a wealth of evidence demonstrating that Smith was an appalling and known prevaricator. Finally, Payne presented evidence tending to show that defense counsel did little to prepare a case in mitigation of punishment prior to the verdict in the guilt phase of the trial.

The state habeas court found incredible the inmates' testimony indicating that Smith was the perpetrator. It ruled that Smith's affidavit was inadmissible for the truth of the matter asserted therein and noted that Smith stood by his trial testimony during the habeas hearing, explaining that he had signed the affidavit only because he was pressured to do so. Further, the state habeas court found that there had been no undisclosed inducements or promises made to Smith in exchange for his testimony. And, the state habeas court rejected Payne's ineffective assistance claims, finding neither inadequate performance nor prejudice. The Virginia Supreme Court denied review, and the Supreme Court again denied a writ of certiorari, Payne v. Thompson, 506 U.S. 1062 (1993).

Payne thereafter filed this § 2254 petition. The district court refused to conduct an evidentiary hearing, held a number of Payne's claims to be procedurally defaulted, and dismissed the petition after finding the remaining claims to be without merit. Payne v. Thompson, 853 F. Supp. 932 (E.D. Va. 1994). Payne now appeals that decision.

II.

The principal argument Payne raises on appeal, in various forms, is that he is factually innocent of Dunford's murder and that Smith lied when implicating him during the trial. Payne maintains that the district court erred in rejecting his claim that he was deprived of due process, and therefore was entitled to habeas relief, because: (1) Smith lied during his trial testimony, thereby rendering perjurious the testimony employed to obtain his conviction; (2) the prosecution knowingly used Smith's perjured testimony; and (3) the prosecution failed to disclose various inducements provided to Smith for his testimony. These arguments, however, lack merit.

The state habeas court found as facts--based, in part, upon the lack of credibility exhibited by the inmate witnesses Payne presented during the state habeas proceeding--that Smith did not commit perjury during Payne's trial; that although Smith received additional favorable treatment, there were no undisclosed inducements offered or promises made to Smith in return for his testimony; and that prosecutors had no actual knowledge of perjury by Smith. Because fair support for these factual findings exists in the record, the district court properly afforded them a presumption of correctness pursuant to 28 U.S.C.A. § 2254(d),**1** and Payne failed to overcome this presumption. See Sumner v. Mata, 455 U.S. 591, 591-93 (1982) (per curiam) (Section 2254(d) plainly requires a federal habeas court to presume factual findings made by a state court after a full and fair hearing on the merits to be correct unless "not fairly supported by the record."); Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (Section "2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); see also Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988) (That a conviction is based on perjury is not sufficient

_____

**1** We refer to § 2254(d) as it existed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996. Because we conclude that habeas relief is inappropriate and that the district court must be affirmed under the law in effect prior to the recent amendment, we do not address the more demanding standards imposed upon Payne under the new Act. See Sherman v. Smith, No. 94-6831, 1996 WL 397248, at *10 n.1 (4th Cir. July 17, 1996) (en banc).

to warrant the grant of habeas relief; the prosecution must have known the testimony was false.), cert. denied , 489 U.S. 1071 (1989).**2**

III.

Payne also contends that the district court erred in concluding that he was not deprived of his Sixth Amendment right to effective assistance of counsel. He maintains that his trial attorneys were ineffective during the guilt and sentencing phases of his trial in failing to use all information available to impeach Smith, to prepare for Clements' testimony, to call additional witnesses, and to seek or present evidence in mitigation of sentence.

This court reviews de novo Payne's claim that he received ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 698 (1984). After careful consideration, we find Payne's arguments to be without merit. Counsel's performance did not fall below the broad range of professionally competent assistance, and a reasonable probability does not exist that the result of the proceeding would have been different except for the errors alleged to have been committed by counsel. See id. at 690, 694.

_____

**2** Payne further argues that because he is factually innocent of murdering Dunford, he is entitled to a writ of habeas corpus. This claim also lacks merit. As noted above, the state habeas court found incredible all of the evidence to which Payne points in support of his claim. And, in Herrera v. Collins, 506 U.S. 390, 400-02 (1993), the Supreme Court indicated that federal habeas corpus has not been the traditional forum for a claim of "actual innocence" as a stand-alone claim (as opposed to a gate through which an otherwise procedurally-defaulted claim may be adjudicated). Although the Court left open the possibility that "a truly persuasive demonstration of `actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," Payne's attempted showing of innocence falls far short of the "extraordinarily high" threshold showing necessary to trigger such relief. Id. at 417; Spencer v. Murray, 5 F.3d 758, 766 (4th Cir. 1993), cert. denied, 114 S. Ct. 1208 (1994).

7

IV.

Payne asserts that the testimony of prosecution witness Dr. Centor, who testified during the sentencing phase of the trial that Payne would be dangerous in the future, violated his Fifth Amendment privilege against compelled self-incrimination and his Sixth Amendment right to assistance of counsel. In Estelle v. Smith, the Supreme Court discussed a criminal defendant's Fifth and Sixth Amendment rights in the context of the introduction during capital sentencing of psychiatric testimony that the defendant would pose a future danger. Estelle v. Smith, 451 U.S. 454 (1981). The record demonstrated that the state trial court had ordered that the defendant be evaluated; that the defendant had not been given warnings set forth in Miranda v. Arizona, 384 U.S. 436, 467-73 (1966); and that his attorney had not known of the examination. Estelle v. Smith, 451 U.S. at 456-60. Noting that the psychiatrist "drew his conclusions largely from[the defendant's] account of the crime during their interview," id. at 464, the Court held:

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because [the defendant] did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what[the defendant] said to [the psychiatrist] to establish his future dangerousness.

Id. at 468. Payne contends that his Fifth and Sixth Amendment rights were violated because, as in Estelle v. Smith , he was not given Miranda warnings or informed that his statements might be used to establish future dangerousness during sentencing. **3**

_____

**3** We assume the factual basis exists for these arguments although Dr. Centor's trial testimony did not address this question and no court has rendered a factual finding with respect to the issue. Because we conclude that Payne's arguments lack merit in any event, we have no occasion to remand for further proceedings to permit a resolution of this issue.

8

Payne's Fifth Amendment argument must fail, however, in light of our recent decision in Savino v. Murray, 82 F.3d 593, 604 (4th Cir. 1996), cert. denied, No. 95-5164, 1996 WL 400267 (U.S. July 17, 1996), in which we rejected an Estelle v. Smith argument, reasoning in part:

> In [Estelle v. Smith], the Court differentiated between a defendant who intends to introduce psychiatric evidence on his own behalf and one who "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence." When a defendant asserts a mental status defense . . . , he may face rebuttal evidence from the prosecution taken from his own examination or he may be required to submit to an evaluation conducted by the prosecution's own expert. That defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal to the defense's psychiatric evidence. In essence, the defendant waives his [Fifth Amendment] right to remain silent-- but not his [Sixth Amendment] right to notice--by indicating that he intends to introduce psychiatric testimony.

Id. (citations omitted). Under this reasoning, when Payne introduced the psychiatric evidence relating to his future dangerousness, he waived his Fifth Amendment right to remain silent. See also Powell v. Texas, 492 U.S. 680, 683-84 (1989) (per curiam); Buchanan v. Kentucky, 483 U.S. 402, 421-24 (1987).

Payne also asserts that he was deprived of his Sixth Amendment right to counsel because his attorneys believed that he would be examined only for competency. A defendant is deprived of his Sixth Amendment right to counsel if there is no effective opportunity for the defendant to consult with his attorney concerning his right to remain silent prior to a psychiatric examination, and such an opportunity is effective only when the attorney is informed of the scope, nature, and intended uses of the evaluation. Estelle v. Smith, 451 U.S. at 469-71; Savino, 82 F.3d at 603-04. Since Payne requested the examination, and thus had adequate notice that the examination would occur, his Sixth Amendment rights were not violated as long as his attorneys possessed adequate notice that information gained during the competency examination could be used in rebuttal if he were to

9

introduce during sentencing psychiatric evidence relevant to future dangerousness. We conclude that they did.

In Buchanan, the Supreme Court addressed a similar Sixth Amendment claim and stated:

> Given our decision in [Estelle v. Smith], . . . counsel was certainly on notice that if, as appears to be the case, he intended to put on a "mental status" defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal. In these circumstances, . . . there was no Sixth Amendment violation.

Buchanan, 483 U.S. at 425. As in Buchanan, the decision of the Supreme Court in Estelle v. Smith put Payne's attorneys on notice that the introduction during capital sentencing of psychiatric evidence addressing future dangerousness by the defense would permit the prosecution to offer rebuttal evidence based upon Payne's statements during the competency exam. Hence, Dr. Centor's testimony was not obtained in violation of Payne's Sixth Amendment right.

Moreover, even if we were to conclude that the admission of Dr. Centor's testimony violated Payne's Fifth and Sixth Amendment rights, any error would be harmless. See Satterwhite v. Texas, 486 U.S. 249, 258 (1988); Savino, 82 F.3d. at 605. The jury did not find that Payne would be dangerous in the future and did not impose the death penalty on the basis of future dangerousness; the jury found only the "vileness" aggravating factor. Under Virginia law, if the jury finds one aggravating circumstance, it considers all of the evidence adduced during the guilt and sentencing stages of trial to determine whether a death sentence is appropriate. Tuggle v. Netherland, 79 F.3d 1386, 1393 (4th Cir. 1996), petition for cert. filed, No. 96-5364 (U.S. July 26, 1996). Since the vileness aggravating factor served to support the death sentence, we must analyze the likelihood that an Estelle v. Smith error had a substantial and injurious effect on the verdict. Id. We conclude that it did not.

There is no reasoned argument that Dunford's murder was not vile: He was burned alive in such a way that he lingered for days in agony before his death. Further, Payne had been convicted of capital murder

10

previously and committed the instant offense while serving a life sentence. Virtually no mitigating evidence was introduced. Further, Dr. Centor's arguably improper testimony concerning Payne's future dangerousness was all but cumulative of indisputably proper testimony by the doctor to the effect that one who has already committed two capital murders has a high probability of committing future criminal acts of violence. Presented with all of the evidence from trial and sentencing, and having accepted that Payne in fact committed this atrocious crime, the jury was not likely influenced by Dr. Centor's allegedly improper testimony. See id. at 1393-96. Thus, we conclude that any Estelle v. Smith error did not have a "`substantial and injurious effect or influence'" on the decision of the jury to impose a death sentence. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).**4**

V.

Payne's remaining claims that the state trial court failed to provide an instruction defining torture and an instruction advising the jury that it could impose a life sentence are procedurally defaulted. Payne failed to object at trial and failed to assert any issue related to the jury instructions on direct appeal. He first raised these issues in his state habeas petition. The state habeas court dismissed the claims as procedurally defaulted for failure to raise them in the initial proceedings or on direct appeal, citing Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974), cert. denied, 419 U.S. 1108 (1975). And, the Virginia Supreme Court expressly found the claims procedurally barred. As a consequence, this court may not address these issues absent cause and prejudice to excuse the default or a showing that a miscarriage of justice would result from the failure to do so. Coleman v. Thompson, 501

_____

**4** We cannot accept the Commonwealth's argument that these claims are procedurally defaulted. Payne objected to Dr. Centor's testimony at trial and raised these exact claims in his direct appeal to the Virginia Supreme Court. That court rejected the claims, reasoning that since the jury had imposed the death sentence only on the basis of the vileness aggravating factor and had not found Payne to be a future danger, the arguments were moot. See Payne, 357 S.E.2d at 506. Further, the court ruled that Estelle v. Smith was not controlling because Payne had requested the psychological examination. Id.

11

U.S. 722, 750 (1991). Although Payne attempts to establish cause by arguing that his attorneys were ineffective in failing to preserve these issues, his failure to have alleged this ineffectiveness claim as a separate issue during his state habeas proceeding prevents him from establishing cause on this basis. See Justus v. Murray, 897 F.2d 709, 714 (4th Cir. 1990). Further, Payne has failed to demonstrate actual innocence. See Schlup v. Delo, 115 S. Ct. 851, 867-69 (1995).

VI.

For the reasons set forth above, we conclude that the district court properly denied Payne's petition for a writ of habeas corpus. Accordingly, we affirm.

AFFIRMED

MICHAEL, Circuit Judge, concurring:

I concur in the judgment and in all of the majority opinion except for its discussion, ante at 8-9, of Estelle v. Smith, 451 U.S. 454 (1981). I respectfully disagree with the majority's conclusion that Payne's Fifth Amendment rights were not violated when Dr. Centor testified at the trial's penalty phase about whether Payne posed a risk of future dangerousness.

Payne and his lawyers believed that Dr. Centor interviewed Payne solely for the purpose of determining Payne's competency to stand trial. And although Payne was told in general terms that statements he made to Dr. Centor could be used against him, Payne was never expressly told that his statements could be used to determine whether he should get the death penalty.

During the prosecution's case-in-chief at the penalty phase of Payne's trial, Dr. Centor testified about the results of his competency examination of Payne and about statements Payne made to him during that examination. Admission of this evidence was error because at the time it was offered Payne "neither had asserted an insanity defense nor had offered psychiatric evidence at trial." Buchanan v. Kentucky, 483 U.S. 402, 422 (1987). This evidence was properly allowed at

12

Payne's earlier competency hearing because Payne put his competency in issue and because his lawyers knew he was being examined to determine competency. But "given the gravity" of a death sentence, the evidence should not have been introduced at the trial's penalty phase even though the evidence had earlier been used for the limited purpose of determining competency. Estelle, 451 U.S. at 463 (1981). The evidence did not become admissible simply because Payne's competency had been in issue before trial, nor because Payne put the state to its proof on the issue of whether the death penalty was appropriate. Estelle, 451 U.S. at 465. Unlike the accused in Savino v. Murray, 82 F.3d 593, 604 (4th Cir. 1996), cert. denied, 1996 WL 400267 (U.S. July 17, 1996), Payne was not expressly warned "beforehand that any information he gave to the psychiatrist could be used in the capital sentencing phase." Payne believed he was being examined "for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to" him. Estelle, 451 U.S. at 465. The prosecution improperly used Payne's "own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." Id. at 466. Thus, it was error to let Dr. Centor tell the jury about statements Payne made to him during the competency examination.

I concur in the judgment, however, because I agree with the majority's alternative analysis, see ante at 10-11, that the admission of Dr. Centor's testimony was in any event harmless error. Thus, I believe that the error did not have a substantial and injurious effect on the jury's decision. The jury based its verdict of death on its finding that Payne's crime was exceedingly vile.

13